**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**GENERAL METALS PRODUCTS COMPANY, Respondent.**

**No. 18374.**

United States Court of Appeals Sixth Circuit.

April 11, 1969.

Seth Rosen, N.L.R.B., Washington, D. C., for petitioner; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Michael N. Sohn, Edith E. Nash, Attys., N.L.R.B., Washington, D. C., on brief.

William E. Fortas, Memphis, Tenn., for respondent; Carroll C. Gilpin, Tralles, Hoffmeister & Gilpin, St. Louis, Mo., Fortas & DeHart, Memphis, Tenn., on brief.

Before O'SULLIVAN, PECK, and COMBS, Circuit Judges.

COMBS, Circuit Judge.

The National Labor Relations Board found that General Metals Products Company violated Section 8(a) (1) of the National Labor Relations Act by interfering with, coercing and restraining

employees in the exercise of union organizational activities. The Board petitions for enforcement of its order.

The company's main office and factory are located in St. Louis, Missouri. In 1965, a branch plant was established in Humboldt, Tennessee. Frank Warmath, a resident of Humboldt, played a key role in persuading the company to come to that community. He is a lawyer with extensive interests and great influence in the community. During the time in question he was chairman of the board of a local bank, partner in a real estate agency, part owner of the land on which the plant was located, and financially interested in the construction company which built the plant.

In early 1966, a union organizational drive was commenced at the Humboldt plant and a petition for election was filed. A meeting was held between company and union officials and the company agreed to hold an election. Warmath, though not officially representing the company, was present at this meeting. He met frequently with company officials both before and during the union campaign and was a personal friend to the company president, Ralph Mattick. The meetings were ostensibly social but company business and the union campaign were discussed. In response to a company official's statement that "they didn't want the Union down there," Warmath said he was interested in seeing that nothing took place.

Warmath discussed the union with his business and political associates, including G. Griffin Boyte, his law partner; Robert White, a real estate partner; Annie Lou Cox, manager of a bank of which he is board chairman; and Otis Milligan, a local grocer and politician.

Activities of the townspeople included the following incidents. A plant employee, Danny Porter, received a traffic ticket during the union campaign. Complaining that the ticket was unreasonable, he went to see the Mayor of Humboldt who sent him to Warmath. Warmath fixed the ticket and then asked Porter about the union. He told Porter that no union was needed; he said that he had done Porter a favor and that Porter could now do him one. The return favor was not specified.

Another employee, Terry Stephens, received telephone calls from Robert White and Annie Lou Cox. White told him he would appreciate it if Stephens didn't vote for the union. Miss Cox said the company wasn't ready for the union, and she would like to influence Stephens "in any way she could" not to vote for the union.

Miss Cox also called the home of employee Jack Cross. Speaking to Mrs. Cross, she said that the company might leave if the union came in. Cross was approached by Otis Milligan who said "they" sent him to talk with Cross about the union. Milligan said that the company might move if the union came in and that the election should be postponed for a while. Milligan reported his conversation to Warmath.

Warmath's law partner, Boyte, sent a message to the plant to have an employee, Vernon Bolin, come to his office for a talk. Boyte told Bolin that he was concerned about a union, that it was not needed, and reminded him that another factory in Humboldt had closed when the union came in.

Company officials made no secret of their opposition to the union. Raymond E. Stevens, plant superintendent, asked an employee if he had received any company literature and what he thought about the union. The employee complained about a lack of washing facilities at the plant and Stevens said that soap would be cheaper than union dues.

Two days before the election, Mattick, the company president, spoke to the assembled employees. He told them not to destroy their opportunities, pointing out the company's policy of promoting employees and future growth possibilities of the plant. He said success would come by cooperating and working together and that no "witch doctor" was needed. He stated that it was up to the employees to decide whether the plant

would "change from a branch plant to something else." A majority of the employees voted against the union in the election.

The company contends that no agency relationship was established between the townspeople and the company and that the company is not responsible for their actions. The Board points to Warmath's close connections with the company and his connections with the other townspeople as establishing agency within the necessary limits.

There is no question but that the activities of Warmath and his associates were coercive in nature. The pivotal question is whether their conduct can be attributed to the company. In dealing with this question, we look to the Congressional Act and the cases interpreting it. In International Association of Machinists, Tool and Die Makers Lodge No. 35, etc. v. National Labor Relations Board, 311 U.S. 72, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50 (1940), the Supreme Court emphasized the general policy underlying passage of the Act:

"The employer, however, may be held * * * [responsible] even though the acts of the so-called agents were not expressly authorized or might not be attributable to him on strict application of the rules of *respondeat superior*. We are dealing here not with private rights * * * nor with technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants, but with a clear legislative policy to free the collective bargaining process from all taint of an employer's compulsion, domination, or influence. The existence of that interference must be determined by careful scrutiny of all the factors, often subtle, which restrain the employees' choice and for which the employer may fairly be said to be responsible."

This reasoning was reaffirmed in Packard Motor Car Co. v. National Labor Relations Board, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947).

*International Association of Machinists* and *Packard* were decided under the Wagner Act. "Employer" was defined in that Act to include "any person acting in the interest of an employer, directly or indirectly." With the passage of Taft-Hartley in 1947, the term "agent" was brought into the Act. "Employer" was then defined to include "any person acting as an agent of an employer, directly or indirectly." Section 2(2), National Labor Relations Act, as amended, 61 Stat. 137 (1947), 29 U.S.C. § 152(2). The 1947 Act included this addition:

"In determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."

The legislative history and the language of Section 2(2) make it clear that Congress intended by the amendment to exonerate management of responsibility for the acts of those beyond its control and direction. But, it is just as clear by the terms of Section 2(2), as amended, and by the addition of Section 2(13) that Congress intended that strict rules of agency should not be applied in determining employer responsibility. Cramco, Inc. v. N. L. R. B., 399 F.2d 1 (5th Cir. 1968); Furr's Inc. v. N. L. R. B., 381 F.2d 562 (10th Cir. 1967), cert. denied, 389 U.S. 840, 88 S.Ct. 70, 19 L.Ed.2d 105 (1967); Amalgamated Clothing Workers v. N. L. R. B., 125 U.S.App.D.C. 275, 371 F.2d 740 (1966); Colson Corporation v. N. L. R. B., 347 F.2d 128 (8th Cir. 1965); Lummus Co. v. N. L. R. B., 119 U.S.App.D.C. 229, 339 F.2d 728, 735 (1964); N. L. R. B. v. Arkansas-Louisiana Gas Co., 333 F.2d 790, 795 (8th Cir. 1964); N. L. R. B. v. Champa Linen Service Co., 324 F.2d 28 (10th Cir. 1963); Local 636, etc., Plumbing & Pipe Fitting Industry of United States v. N. L. R. B., 109 U.S.App.D.C. 315, 287 F.2d 354 (1961).

The foregoing cases follow the principles of *International Association of*

*Machinists, supra,* either in specific language or by strong implication. It is clear, therefore, that in determining the company's responsibility for the acts of others the rules of agency shall be given a liberal construction.

■ Under these guidelines, we conclude that there is substantial evidence from which the Board could reasonably impute the conduct of Warmath and his associates to the company. Although Warmath had no official connection with the company, as part owner of the land on which the plant was located and as the owner of extensive business interests in the community, he stood to benefit financially from the continued operation of the plant. At numerous meetings between Warmath and company officials, the union situation was discussed and Warmath was told that the company was opposed to being organized at that time. He maintained that the company "didn't specifically ask me to do anything," but he admitted that he had obtained the names of employees from company officials and that company officials knew he had talked to certain employees. Moreover, Warmath visited the plant on several occasions and significantly was present at the meeting where it was agreed to hold a consent election. To hold that the company was unaware of his activities or disapproved of them would be contrary to reason and common sense. Since company officials were aware of his activities, their acquiescence must be construed as approval. See *Amalgamated Clothing Workers, supra,* and *Colson Corporation, supra.*

A somewhat similar situation was presented in N. L. R. B. v. Lake Butler Apparel Co., 392 F.2d 76 (5th Cir. 1968). There, the Union County Development Authority had promoted and financed the company's plant and, to some extent, was financing its current operations. Certain members of the board of directors of the Authority had made threats to individual employees during a union campaign. In holding the company responsible for the directors' activities, the court noted that the agency connection between the company and the Authority was established by the fact that the company president supplied the Authority with a list of employees and took no action to avoid the violative conduct of the directors.

Warmath enlisted the aid of his business associates and friends to defeat the union. Since these people were acting under his directions, it follows that the company is responsible for their actions. The employees were led to believe that Warmath and his associates were acting for the company. For example, employee Cross testified that the grocer, Milligan, told him that "they sent him down there to talk to me about the union, not mentioning who they were." Employee Bolin testified that Warmath's law partner told him that "he [Boyte] wanted to talk to some of the people out at General Metals, and that he might want to talk to me again."

It is likewise significant that the conversations of the townspeople followed a specific pattern. In each case where an employee was interrogated primary emphasis was placed on the fact that the company was new in Humboldt and that unionization might cause loss of the plant to the community. Although each citizen-interrogator contended that this was his own idea, this also was the central theme of the company's anti-union campaign, keynoted by the speech of its president, Mattick, and confirmed by the letters sent to employees from the company's main office. Substance must prevail over form and, since the strict rules of agency are not controlling, we think the record supports the Board's conclusion that the company knew of, approved, and by its silence confirmed the actions of Warmath and his associates.

■ We are not holding that the speech of president Mattick or the interrogation of an employee by plant superintendent Stevens, standing alone, constitutes a violation of the Act. See N. L. R. B. v. Uniform Rental Service, Inc., 398 F.2d 812 (6th Cir. 1968). But, both incidents must be considered as part of a pattern of conduct which includes

the activities of Warmath and his associates. Since we hold that the latter activities are clear violations, it follows that the Board's order should be enforced.

It is so ordered.