**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**Edward MEARS et al., Respondents.**

**No. 18512.**

United States Court of Appeals,
Third Circuit.

Argued Oct. 9, 1970.

Decided Dec. 22, 1970.

1. See NLRB v. Amalgamated Clothing
Workers of America, 5 Cir., 1970, 430
F.2d 966.

**504**

Jesse I. Etelson, Marcel Mallet-Prevost, Asst. General Counsel, National Labor Relations Board, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Herman M. Levy, Attys., N.L.R.B., on the brief), for petitioner.

Anthony J. Leggio, Mitchell, Plate & Anderson, Atlanta, Ga., for respondents.

Before KALODNER, STALEY and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

The National Labor Relations Board in this case petitions pursuant to section 10(e) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. (1964) for the enforcement of an order made by it on May 2, 1969 against respondents in a proceeding in which it found that respondents had violated section 8(a) (2) and (1) of the Act by assisting a union in its organizational efforts and by recognizing that union as the exclusive bargaining representative of their employees when the union did not represent an uncoerced majority. The Board also found violations of section 8(a) (2) (3) and (1) in the maintenance of union security clauses, and of section 8(a) (1) in coercive interrogation, threats of loss of employment, and creating the impression of surveillance.

Each of the respondents is engaged in coal mining operations in Indiana County, Pennsylvania. Seven coal mines, and one coal tipple are involved. Until late November of 1967 the seven mines and cne coal tipple operated without union contracts. In that month organizing efforts took place on behalf of both the United Mine Workers of America (UMW) and the Southern Labor Union (SLU). Both the UMW and the SLU filed charges with the Board, and as a result separate complaints issued. In N L R B v. United Mine Workers of America, 429 F.2d 141 (3 Cir. 1970) this court granted enforcement of the Board's order prohibiting the UMW from restraining and coercing employees of Mears Coal Company, one of the respondents here, and from restraining and coercing members of the SLU in their rights guaranteed by section 7 of the National Labor Relations Act. The violent reaction of the UMW to the incursion of SLU into what the UMW regarded as its own preserve, which is the subject matter of that case, took place shortly after the events with which we are now concerned. The events presently in question relate to the execution of seven collective bargaining contracts between the SLU and the various respondents as follows:

1. November 17, 1967, Peles Brothers Coal Company, Glen Campbell, Pa. The Peles Brothers mine is oper-

ated by a partnership in which Joseph Peles and Nestor Peles are partners. This contract covered over 12 employees. It was signed on behalf of the partnership by Nestor Peles.

2. November 17, 1967, Dixon Run Coal Company, Marion Center, Pa. The Dixon mine is operated by a partnership in which Edward Mears, Charles Mears, Murray Martin and Earl Bence (Mears Coal Company) have a half interest and K and S Coal Company, Inc., a corporation, has a half interest. This contract covered 30 employees. It was signed on behalf of the partnership by Harold Kammerdiener, the mine superintendent and a stockholder in K and S Coal Company.

3. November 18, 1967, Mears Coal Company, Marion Center, Pa. The Mears open pit mine and mine tipple (coal cleaning and car loading facility) is operated by a partnership in which Edward Mears, Charles Mears, Murray Martin and Earl Bence are partners. This contract covers an undisclosed number of employees. It was signed on behalf of the partnership by Edward Mears.

4. November 18, 1967, Copper Valley Coal Company, Clymer, Pa. The Cooper Valley mine is operated by a partnership in which Edward Mears, Charles Mears, Murray Martin, Earl Bence (Mears Coal Company), Harold Leasure, Russell Herby and Robert Gilbert are partners. This contract covers 25 employees. It was signed on behalf of the partnership by Robert Gilbert.

5. November 20, 1967, Chestnut Ridge Mining Co., Clymer, Pa. The Chestnut Ridge mine is operated by a partnership in which Edward Mears, Charles Mears, Murray Martin and Earl Bence (Mears Coal Company) have a half

interest and John Peles has a half interest. The contract covers 15 employees. It was signed on behalf of the partnership by John Peles.

6. November 21, 1967, Penn Hill Coal Co., Inc., Indiana, Pa. The Penn Hill mine is operated by a corporation. Its stockholders are Howard E. Friel, Kenneth Leasure, and Donald Leasure, Sr. The contract covers 18 employees. It was signed on behalf of the corporation by Howard E. Friel and Kenneth Leasure.

7. December 1, 1967, MY Coal Co., Indiana, Pa. The MY mine is operated by a partnership in which Edward Mears, Charles Mears, Murray Martin and Earl Bence (Mears Coal Company) have a half interest and Rocco Yanity, Anthony Yanity and Casmer Yanity (Yanity Brothers) have a half interest. The contract covers 18 employees. It was signed on behalf of the partnership by Rocco Yanity.

Prior to November, 1967 the SLU did not have any contracts in Pennsylvania. So far as the record discloses the first interest shown by the SLU in Indiana County was on November 4, 1967 when Ted Q. Wilson, its general counsel, telephoned Nestor Peles of Peles Brothers and obtained certain information about Peles Brothers non-union operation. The first on the scene organizational activity of the SLU took place on November 10 when some SLU official, Mr. Wilson apparently, flew into the Indiana County airport in a private airplane. The next on the scene organizational activity took place on November 16 when signatures on SLU authorization cards were first solicited at Penn Hill, Dixon Run, Peles Brothers, and possibly Chestnut Ridge. On November 17, authorization cards were first solicited at Copper Valley, at Mears Coal, at MY Coal and probably at Chestnut Ridge. Authorization signatures were again solicited at MY Coal on November 18 and November 20. At each of the seven mines the SLU ob-

tained signed authorization cards from a majority of the employees. At each mine the union was recognized upon verification of signatures, and each of the contracts listed above was executed after a short, separate negotiating session. The contracts set forth significant differences in job classifications, in pay scales and in vacation benefits at the different mines. All except two (Chestnut Ridge–two years, and Peles Brothers –two and one-half years) ran for three years. One, Dixon Run, provided for annual reopening for wage and benefit adjustments, and another, Penn Hill, provided only for wage renegotiations after one year. Two, Peles Brothers and Penn Hill, provided a per ton production bonus over a certain production for each production man. The contracts were uniform, however, in many respects; especially in requiring each mine to pay a royalty to the "Southern Labor Union Welfare Fund" [1] of ten cents per ton, in requiring union membership as a condition of employment, and in providing for dues check-off.

The UMW, surprised by the speed with which the SLU was able to obtain recognition compared with its own lack of success in Indiana County, on November 28, 1967 filed with the Regional Director, Region 6 of the National Labor Relations Board the first of a series of charges. These charges resulted on March 29, 1968, in a consolidated complaint against all the instant respondents, but not against the SLU. That union appeared in the Board proceedings as an intervenor, not as a respondent. The trial examiner issued his decision on November 6, 1968, and on May 2, 1969, the Board adopted his findings, conclusions and recommended order, with certain clarifications. It found that each respondent's interest and action so allied it with the other respondents "that it may be fairly inferred that the several Respondents were acting in concert in pursuit of the common objective of avoiding the possibility" of the UMW organizing their employees. It found that the SLU solicitors Donald Leasure, Jr., Ronald Thornton, and Robert Dougherty, were agents for all of the respondents both when they spoke to the employees, and when they engaged the services of two other solicitors who spoke to employees at different mines. It found that all the solicitors were, therefore, agents of all the respondents in urging membership in the SLU, and in conveying what the Board regarded as threats to close down if the UMW succeeded in organizing. It found that some respondents had made threats, or committed unlawful interrogations, and held each liable for the acts of all the others. The Board's order required respondents to cease giving effect to each collective bargaining agreement, but without changing any of the bargained for conditions of employment, including payment of the ten cent a ton royalty to the SLU Welfare Fund. It prohibited recognition until after an NLRB certification. It also entered a Brown-Olds type reimbursement order, requiring each respondent (though not the SLU) to reimburse each employee for dues which it had checked off and remitted to the SLU.

The Board's decision in effect held each respondent to be the agent of every other respondent, and each SLU solicitor to be the agent of each respondent, and thus made each respondent liable:

(1) for employer assistance and support to the SLU, in violation of Section 8(a) (2) and (1) of the Act,

(2) for maintaining union-security clauses in their SLU contracts when the SLU did not represent an uncoerced majority, in violation of Section 8a(2), (3) and (1) of the Act,

(3) for coercively interrogating employees about participating in

1. A separate entity created in compliance with Section 302(c) of the Labor-Management Relations Act of 1947, 29 U.S.C. § 186 (1964).

UMW activities by creating the impression that such participation was under surveillance, and,

(4) for threatening their employees with loss of employment if they selected the UMW to represent them.

We are presented with the issue whether these sweeping findings of agency are supported by substantial evidence on the record as a whole. Section 10(e), 29 U.S.C. § 160(e) (1964). We may, of course, modify the Board's decree if we find that it lacks an evidentiary basis in the record as a whole for all the relief decreed. In that case we can tailor our enforcement order so that it applies only to those violations for which there is an evidentiary basis. E. g., N. L. R. B. v. Local 825, IUOE, 410 F.2d 5, 11 (3 Cir. 1969); N L R B v. Teamsters Local 830, 281 F.2d 319 (3 Cir. 1960); Lakeland Bus Lines, Inc. v. N L R B, 278 F.2d 888 (3 Cir. 1960).

■ The Board in accepting the trial examiner's conclusion of joint responsibility for all unfair labor practices said:

In reaching this result we view the present record as establishing that each respective Respondent's interest and action allied it so closely with the other Respondents that it may be fairly inferred that the several Respondents were acting in concert in pursuit of the common objective of avoiding the possibility of the United Mine Workers * * * organizing their employees, and that liability must attach to all. 175 NLRB No. 136 (1969).

With due deference to the Board, we do not view the record as permitting any such inference. Indeed on the record such an inference would be based on suspicion and speculation rather than on evidence.

We take it as undisputed that each respondent shares a preference for the ten cent a ton coal royalty imposed by the SLU for its welfare fund over the forty cent a ton royalty imposed by the UMW for its welfare fund. Such a common

preference for the retention of thirty cents a ton is not, however, evidence of concerted action. There is no direct evidence of concerted action, and each witness who might have direct knowledge of it denied it. The trial examiner attaches significance to the fact that several SLU solicitors (whom he found to be agents of the respondents) made reference to the fact that payment of the forty cent UMW royalty would endanger the continued working of the mines. The finding that all solicitors were management agents depends upon the finding of concerted action. In the context of the non-union coal industry in Indiana County, in November, 1967, the solicitors' use of an argument against the forty cent a ton royalty which was a matter of common knowledge is no evidence even of concerted action among themselves, never mind evidence that they were acting for joint principals. In the general counsel's case it was established that the UMW itself was not pressing its organizing efforts, after an unsuccessful attempt to organize one mine in 1966, until markets closer to this remote area became available. (DeGretto testimony 240 app.). That common reference was made to the thirty cent royalty differential is in these circumstances an insufficient basis for the Board's finding of concerted action.

The Board relies on the existence of certain familial relationships to establish concerted action. Joseph and Nestor Peles, owners of Peles Brothers Coal, are cousins of John Peles, a one-half owner of Chestnut Ridge. There is no evidence of any communication between these cousins on any subject. Kenneth Leasure and Donald Leasure, Sr., brothers, are stockholders in Penn Hill. Harold Leasure, son of Donald Leasure, Sr. and nephew of Kenneth, is a partner in Copper Valley. There is no evidence of any communication between these three on any subject. Finally, Harold Leasure and Donald Leasure, Jr., brothers, are partners in H & D Trucking Company, which owns coal hauling trucks. As we mentioned heretofore, Donald Leasure,

Jr. solicited authorizations on behalf of the SLU. He was paid for this effort by the SLU. There is no evidence of any communication between the elder Leasures and Donald, Jr. on any subject, and there is no evidence that the younger Harold Leasure participated in any way in the SLU solicitation.

The Board relies on certain economic relationships between the parties as evidence of concert of action. There are significant economic relationships between some of the respondents. But some of the economic relationships referred to by the Board are extremely remote. The only economic connection between Peles Brothers and any other respondent is that Peles Brothers occupies part of its mining properties under a lease from the Yanity Brothers, who are partners in MY Coal. The only economic ties between Penn Hill and any other respondent is that Penn Hill sells its coal to Mears Coal Co., where it is cleaned and loaded for resale on the Mears tipple.

■ At least with respect to Peles Brothers and Penn Hill Coal Corp. there is no evidence which supports the Board's conclusion that they were acting in such concert with the others that they can be charged with responsibility for the act of every agent of every other respondent. We must, we think, determine their guilt or innocence of unfair labor charges by what they did, or what was done by people whose agency for them was established in the record. Such agency is not, of course, confined to cases of actual authority. 29 U.S.C. § 152(13) (1952); International Association of Machinists v. N L R B, 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50 (1940).

■ Peles Brothers mine was the first to sign a contract. The evidence with respect to it is in the testimony of Byrge, president of SLU, Wilson, general counsel of SLU, Nestor Peles, partner, Donald Leasure, Jr., the principal SLU solicitor in the area, and Walter A. Yeager, an employee. Yeager is the only Peles Brothers employee who testified. That evidence discloses that on November 4, 1967 Wilson called Nestor Peles and without initially disclosing his identity obtained some information about the production at Peles' non-union coal operation. On November 8, 1967 Nestor Peles, upset about the prospect of unionization, called Wilson. On November 13 Peles again called Wilson. Peles did not recall more than two calls, and Wilson did not recall the subject matter of the third call. By November 10 SLU personnel had arrived in the area by private aircraft.

Donald Leasure, Jr. recruited Louis Bash, a rank and file employee of Peles Brothers, to solicit signatures at Peles Brothers' mine. There is no evidence that Bash or any other employee knew of any connection between Donald Leasure, Jr. and anyone in the management of any respondent. There is no evidence of any contact between Donald Leasure, Jr. and the management of Peles Brothers. On November 16, 1967 Bash and no one else solicited signatures at Peles Brothers. There is no evidence of any conversation between Bash and the management of Peles Brothers prior to the solicitation of signatures.

Donald Leasure, Jr. took the signed authorization cards from Bash, turned them over to Byrge, the SLU president, and showed Byrge the location of the Peles Brothers mine. On November 17 Byrge called on Nestor Peles at the mine, confronted him with 12 signed authorization cards, and asked for recognition. Peles checked the signatures, and told Byrge if that is what the men wanted he would go along with it. Byrge asked permission to speak to the men, and permission was granted. Byrge held a meeting in the bathhouse, with no management people present, at which a local union was organized, and contract terms were discussed. A contract resulted from this meeting and a meeting with Nestor Peles on the same date. It provided for a dollar a day raise and a change in vacation schedules. It continued the practice of paying a production bonus.

Tending to show a violation of Section 8(a) (2) in the evidence outlined above are these three facts:

(1) recognition of the SLU on the basis of signed authorization cards without requiring a representation election,

(2) permitting the SLU to hold a union meeting on company property, and

(3) the prompt execution of a contract.

These facts, while they may be grounds for suspicion, are not in themselves enough to establish that the SLU was chosen by the employees as a result of management assistance or domination. Indeed a holding that these facts alone are sufficient for a finding of employer assistance or domination in the choice of a labor unon might have unfortunate consequences in discouraging non-litigious recognition.

There remains the testimony of the lone Peles Brothers employee, Yeager. Yeager's testimony is consistent with that outlined above. In addition, he testified:

Q. Now, I call your attention to some time in September, 1967, did you have occasion to speak to Nestor Peles concerning unions?

A. Yes, we discussed it on account of bonus plans and stuff like that.

Q. What was that?

A. We talked about paying 40 cents a ton royalty; and, he said it would be pretty hard to pay 40 cents a ton royalty with the wages we were getting.

Yeager acknowledged that he, not Nestor Peles, initiated the conversation. Moreover, that testimony must be read in light of the fact that Peles Brothers, alone among the seven respondents, paid its employees a production bonus. We do not see how this isolated incident, initiated by an employee, evidences unlawful coercion or unlawful assistance.

Undoubtedly Nestor Peles preferred the ten cent, SLU royalty, to the forty cent, UMW royalty, especially when his firm was already paying a production bonus. But the Board's findings of unfair labor practices with respect to recognition of the SLU must be based on some evidence in the record beyond such a preference. The record as a whole does not support the Board's conclusion that any of the twelve Peles Brothers employees who signed authorization cards were influenced in that choice by management. The record is entirely devoid of any evidence of unlawful interrogation or threats by Peles Brothers. With respect to that partnership-respondent we decline to order enforcement of the Board's order.

■ Penn Hill Coal Co., Inc. signed a contract on November 21, 1967. The evidence with respect to it consists of the testimony of Donald Leasure, Jr., the SLU solicitor. Howard Friel, the mine superintendent, Buterbaugh and Scott, rank and file employees at Penn Hill, and Yablonski and DeGretto, officials of the UMW. The testimony establishes that Donald Leasure, Jr., a partner in and occasional truck driver for H & D Trucking Co., which hauled coal from Penn Hill, personally solicited the Penn Hill employees to sign authorization cards on November 16, 1967. Friel, the superintendent, was not present. Leasure, Jr., spoke to 15 or 16 men and obtained 15 signatures of 18 employees. Employee Buterbaugh testified about his November 16 conversation with Leasure, Jr.:

Q. Would you tell us as best you can just what you can recall, what Mr. Leasure said to you that day?

A. Well, he asked me outside and said about how nice a day it was. Then, he got on to—first, he handed me this paper and said that he would like me to listen while he explained some things about a union, which he—or else, we, I can't remember how he put it—had found.

He said that, "Because, on the first of the year, the United Mine Workers are going to put on such a push," he said that either we

would have to go to United Mine Workers or we would have to close down because our company couldn't afford to pay the 40 cents a ton royalty.

But, he said that the Southern Labor Union was only 10 cents a ton royalty and that, "We could afford this if we decide to go Southern Labor Union," and that he would like for me to sign this paper so that we could hold an election for the Southern Labor Union.

Mr. Buterbaugh did not sign an authorization card. Employee Scott testified about a conversation with Leasure, Jr. on November 17, 1967.

Q. How did the conversation start?

A. He asked me to sign a card. I asked him what kind of card.

So, he said a Southern Labor Union card.

Q. Try to speak up a little more, please.

A. He asked me to sign a card. I asked him what kind of card. He said a union card, Southern Labor Union.

He said, "Because the United Mine Workers are going to come in and we can't afford to sign with that union because it costs us too much money."

Q. Do you recall him saying anything else?

A. Yes, he said, "We have a lot of trucks here and I can't afford to lose my trucks."

Q. Was there any mention about picketing?

A. Well, yes, he said maybe they would picket us, picket the mines there.

Q. When you say "they," did he specify who he meant by "they"?

A. The United Mine Workers is what he said I told him, I said that I didn't know anything about this, and that I would think about it.

Q. Did you sign a card at that time?

A. No, I didn't.

On November 20, 1967, Friel and Kenneth Leasure representing Penn Hill met with two representatives of the SLU who presented 15 signature cards, asked for recognition and asked for leave to hold a meeting on the company premises. Leasure, Jr. was not among the SLU representatives on November 20, 1967. Employee Buterbaugh testified that on November 20, 1970, Joe Pearce, assistant mine foreman, told Joe Pardee, the jeep driver who transported men in and out of the mine, to have the day shift men out of the mine 15 minutes early. They came out early, and the SLU organizers conducted a meeting.

On the issue of employer assistance we cannot attach as much significance to the events of November 20, 1967 as did the Board, for by that time 15 out of 18 Penn Hill employees had already signed authorization cards, and Friel had indicated he would recognize the SLU. The cooperative attitude of management is, of course, some evidence of its prior state of mind.

If Donald Leasure, Jr. was on November 16, 1967, actually speaking for management, or if, with the knowledge of any management level Penn Hill personnel, he so appeared to the employees, both his solicitation of signatures and the threats implicit in the conversations with Buterbaugh and Scott would so taint the employees' free choice that the election should be set aside. International Association of Machinists v. N L R B, *supra* 311 U.S. at 80, 61 S.Ct. 83, 55 L.Ed. 50; Department Store Food Corp. v. N L R B, 415 F.2d 74 (3 Cir. 1969); N L R B v. General Metals Products Co., 410 F.2d 473, 476 (6 Cir. 1969). See Boyle's Famous Corned Beef Co. v. N L R B, 400 F.2d 154, 169 (8 Cir. 1968). There is no evidence, however, that anyone connected with the Penn Hill management was even aware of Leasure, Jr.'s November 16, 1967 solicitation. We cannot, as the Board so easily does, infer such awareness from

the fact that his father and uncle were stockholders in Penn Hill. Moreover, there is no evidence that any rank and file employee knew of the relationship between Leasure, Jr. and some of the stockholders of their employer.

There remains the testimony of the UMW officials, Yablonski and DeGretto. Both of them testified that Friel attended a meeting at a motel on December 19, 1967, at which, besides them, Mears and Kammerdiener were also present. The UMW officials accused the coal operators of being a party to bringing in the SLU. One of the coal operators, Mears, said "We had no choice. We couldn't live under your contract." There was a discussion by the UMW representatives of the fact that the UMW was aware of the economics of the industry and had not been pressing its organization drive in the area. Kammerdiener said, "Well, maybe we should have talked to you." Friel although present, did not disavow these tacit admissions of unlawful assistance to the SLU. This evidence is sufficient to support the Board's finding that the Union's organizing efforts at Penn Hill were unlawfully assisted.

■ Unless we attribute to the Penn Hill management the organizing statements of Donald Leasure, Jr. there is no evidence in the record of any threats or unlawful interrogation directed to the Penn Hill employees. His relationship to two Penn Hill stockholders, which, on this record at least, was not known to the employees, is not a sufficient basis for making such an attribution. Compare N L R B v. Hofmann, 147 F.2d 679 (3 Cir. 1945). We will order enforcement of the Board's order against respondent Penn Hill Coal Co., Inc. to the extent that it sets aside the November 21, 1967 contract and prohibits collective bargaining with the SLU until after Board certification. We will decline enforcement against Penn Hill of those provisions of the Board order referring to threats and interrogation. Separate treatment will be made hereinafter of the Brown-Olds remedy.

■ The remaining respondents, Copper Valley, Chestnut Ridge, Dixon Run, MY Coal and Mears Coal Company, probably have enough in common to sustain the Board's finding that they acted in concert in their sponsorship of the SLU. The Mears Coal Company partnership has substantial ownership common, in varying degrees, to all. All sell their coal to the Mears Coal Company tipple. Thornton, who worked out of an office at Mears Coal Company as a common bookkeeper for four of the five mines and who was so known to the employees, became an SLU solicitor. There is evidence of close collaboration in labor matters between Edward Mears, the chief executive of Mears Coal Company, and the chief executives of each of the other four respondents. The admissions of Mears and Kammerdiener to Yablonski and DeGretto referred to hereinabove might, therefore, alone be sufficient to sustain the Board's order setting aside the collective bargaining agreements.

Even in the absence of concerted action, however, there is evidence as to four of these five respondents separately sufficient to sustain that action. Thornton, closely identified with management solicited signatures with management's knowledge at Copper Valley, at Mears Coal and at MY Coal. At Dixon Run, where Kammerdiener was the superintendent and a son and son-in-law were the foremen of the respective day and night shifts, Dougherty, a "face boss" on one shift and a son-in-law of Kammerdiener, solicited signatures with management's knowledge. Dougherty was introduced to the Dixon Run employees at a regularly scheduled monthly safety meeting by Kammerdiener. When Dougherty needed help in explaining the SLU benefits, he sent for and introduced Leasure, Jr. to the meeting. At MY Coal Mears and Yanity arranged for the mine foreman to call a meeting at the change of shift so that Thornton could solicit signatures. Thornton solicited signatures at Copper Valley after receiving permission to do so from Gilbert, the superintendent and a partner.

At Chestnut Ridge the solicitor, Joseph Plavi, on the evidence in the record appears untainted. But John Peles (who has no connection with Peles Brothers), the superintendent and half owner, was in close contact with Edward Mears. Cooperation with the SLU was the order of the day with Mears Coal Company and Mears was a half owner of Chestnut Ridge. See Paul M. O'Neill Int'l. Detective Agency, Inc v. N L R B, 280 F.2d 936, 946 (3 Cir. 1960).

We will, therefore, grant the petition enforcing the Board's order setting aside the collective bargaining agreements of the respondent, Mears Coal Company, and of the four other respondents, Dixon Run, MY Coal, Chestnut Ridge and Copper Valley, in which Mears Coal Company owns a substantial interest.

■ The Board also found that each respondent violated § 8(a) (1) of the Act by interrogating and threatening their employees concerning the employees' selection of, and activities in behalf of, the UMW, and by creating the impression that their activities on behalf of the UMW were under surveillance. The evidence about interrogation and about creating the impression of surveillance is so sparse as to be almost nonexistent. There is no evidence that any employee actually received any impression of surveillance. The single isolated inquiry, in December of 1967, to an employee in a casual conversation about attendance at a UMW meeting, appears in no way threatening. The evidence of interrogation and of creating the impression of interrogation does not warrant the issuance of an injunctive order. There is sufficient evidence in the record as a whole with respect to Mears Coal Company and the respondents in which it has a substantial interest to justify the Board's order prohibiting these respondents from threatening to close their mines in the event of successful UMW organization, and we will grant enforcement of the Board's order prohibiting these respondents from making such threats.

■ Remaining for consideration is the matter of the Brown-Olds remedy. Although the SLU was not made a respondent, the Board ordered that each respondent reimburse its employees for the amounts withheld and deducted from their wages as dues, initiation fees or assessments to be remitted to the SLU, with interest at six percent from the date of withholding the deduction. This order had the effect of requiring double payment since the sums withheld have been turned over to the non-respondent union.

Authority for imposition of this remedy is found originally in Virginia Electric & Power Co. v. N L R B, 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943), in which the Supreme Court approved such an order as implicitly authorized by the statute and designed to aid in effectuation of the policies of the Act. That case involved a union not only sponsored by but even organized on behalf of the employer. In Carpenters Local 60, v. N L R B, 365 U.S. 651, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961) the Supreme Court indicated that where there has been no actual compulsion to join a union, even though there has been an unfair labor practice in the maintenance of an unlawful closed shop preferential hiring agreement, the imposition of the Brown-Olds remedy is punitive, and beyond the power of the Board. This court has consistently refused to enforce a reimbursement order which it found to be inequitable in the circumstances of the case. N L R B v. United States Steel Corp., 278 F. 2d 896 (3 Cir. 1960); Lakeland Bus Lines, Inc. v. N L R B, 278 F.2d 888 (3 Cir. 1960); N L R B v. Local 1566, ILA, 278 F.2d 883 (3 Cir. 1960); N L R B v. American Dredging Co., 276 F.2d 286 (3 Cir. 1960). In none of these was the unfair labor practice employer assistance. The Second Circuit has declined to enforce a reimbursement order even in an employer assistance case absent proof in the record of actual coercion on employees. N L R B v. Burke Oldsmobile, Inc., 288 F.2d 14 (2 Cir. 1961). In the most recent employer assistance case in

this circuit,[2] Paul M. O'Neill Int'l. Detective Agency, Inc. v. N L R B, *supra,* this court enforced the reimbursement order, holding that in the circumstances there present application of the Brown-Olds remedy effectuated the policies of the Act. The Sixth Circuit in an employer assistance case in which the employer was a respondent declined to enforce the reimbursement order against the employer with respect to any funds which it had already turned over to the illegally assisted union. Hughes & Hatcher, Inc. v. N L R B, 393 F.2d 557, 567 (6 Cir. 1968).

Here the general counsel has chosen not to make the SLU a respondent, and the effect of enforcement of the reimbursement order will be to require a second payment by the employer-respondents while the beneficiary of their assistance gets a windfall. Moreover since the Board's order provides, quite correctly we think, for continuance of the bargained for employee benefits, including royalty payments to the SLU Welfare Fund, the order will not have the effect of severing all ties between the employees and the SLU. The reimbursement order does not apply to the welfare fund. True, the welfare fund is an entity separate from the union. But, realistically, future benefits from the welfare fund will depend upon ongoing royalty payments. The fund provides a more substantial focus for employee interest in the SLU than the dues. In these circumstances it is difficult to see how the policies of the Act will be advanced by permitting a windfall to the SLU, which it can use in the new election campaign, while imposing a penalty on the employer-respondents. We decline to enforce the Board's reimbursement order against any respondent.

In summary, we will:

(1) deny the application for enforcement against Peles Brothers Coal Company,

(2) deny the application for enforcement of the reimbursement order,

(3) grant the application for enforcement against Penn Hill Coal Corp. to the extent of paragraphs 1(c), (d), (e), (f) and (g) and paragraph 2(a) of the Board's order,

(4) grant the application for enforcement against the remaining respondents to the extent of paragraphs 1(b), (c), (d), (e), (f) and (g) and paragraph 2(a) of the Board's order,

(5) grant, with respect to all respondents except Peles Brothers, enforcement of an order requiring posting of appropriate notices in conformity with this decision.

A decree in accordance with this opinion may be submitted.

2. See also NLRB v. Spiewak, 179 F.2d 695 (3 Cir. 1950).