[S.F. No. 24098. Mar. 20, 1981.]

VISTA VERDE FARMS, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO, Real Party
in Interest.

308

COUNSEL

Littler, Mendelson, Fastiff & Tichy, Randolph C. Roeder, Harlan E. Van Wye, David S. Durham and Bruce G. Hearey for Petitioner.

Marvin J. Brenner, Dennis M. Sullivan, Thomas Sobel, Ellen Lake and Harry J. Delizonna for Respondent.

Marco E. Lopez, Carlos M. Alcala, Francis E. Fernandez, Carmen C. Flores, Jerome Cohen, William H. Carder, Ellen Greenstone, Sanford N. Nathan, Tom Dalzell, Deborah W. Peyton, W. Daniel Boone, Glenn Rothner, E. Michael Heumann II, Linton Joaquin, Dianna Lyons and Kirsten Zerger for Real Party in Interest.

OPINION

**TOBRINER, Acting C. J.**—In this case we must determine whether a grower who obtains workers through a farm labor contractor may be held responsible under the California Agricultural Labor Relations Act (ALRA) for actions of that labor contractor which improperly interfere with, restrain or coerce such workers in the exercise of their statutorily guaranteed rights. The Agricultural Labor Relations Board (ALRB or Board) concluded in this case that the coercive conduct of a labor contractor on the day preceding a certification election constituted an unfair labor practice for which the grower was responsible. The grower now seeks review of the ALRB ruling, contending that the Board misinterpreted the provisions of the ALRA and misapplied the relevant principles of employer responsibility that have been developed in analogous federal labor authorities.

For the reasons discussed below, we have concluded that the ALRB decision should be affirmed. ██ As we explain, under the ALRA, as

under the National Labor Relations Act (NLRA) upon which the California act was in large measure modeled, an employer may be held responsible for unfair labor practice purposes for any improperly coercive actions which employees may reasonably believe were either engaged in on the employer's behalf or reflect the employer's policy. Thus, even when it is not shown that an employer actually directed, authorized or ratified the improper conduct, an employer who gains the illicit benefit of such coercive conduct may be subjected to appropriate unfair labor practice sanctions in order to protect the workers' rights and in order to deter similar coercive conduct in the future.

We conclude that under the ALRA these general principles of employer responsibility apply equally to the coercive actions of a farm labor contractor hired by a grower as they do to similar coercive conduct engaged in by a supervisor or foremen employed by such grower. Although we reject the union's and Board's additional contention that the language of one section of the ALRA should be interpreted as imposing an even more stringent "strict liability" standard of employer responsibility for labor contractor misconduct under all circumstances, we find that the grower's responsibility in this case is clearly supported under the ALRA's generally applicable standard. Accordingly, we affirm the Board decision.

1. *The facts and proceedings below.*

Petitioner Vista Verde Farms, an entity wholly owned by DMB Packing Corporation, is composed of a group of farms and ranches located near the City of Tracy in San Joaquin County, encompassing an area of approximately 2,300 acres. Vista Verde grows a variety of crops, including bell peppers, cauliflower, tomatoes, cabbages, chile peppers, cucumbers, melons, onions, corn and cereal grains. The property has been operating as an entity since 1954, although it has undergone numerous changes of name and ownership over the years. Sylvester Dumlao is the general manager of Vista Verde, in complete charge of the farm operation; he has worked on the Vista Verde property since 1954, when he was a labor foreman.

Although there are generally only 10 or 12 permanent employees who work the full period that the farm is open, Vista Verde employs up to 600 employees in the peak season. When workers are needed for harvesting, Vista Verde, through Sylvester Dumlao, hires labor contractors to supply farm worker crews. One of these labor contractors is Al-

phonso Di Dios, whose son Bobby is his head foreman; the actions of Bobby Di Dios are principally at issue in the present case.

Although there is no common ownership between Vista Verde and the Di Dios labor contracting business, the Di Dioses have had a long relationship with Sylvester Dumlao and the Vista Verde property, having supplied labor for the farm's harvesting operations since the 1950's. During the period at issue here, farmworker crews from Di Dios were used at Vista Verde during the last week of August 1975 and again beginning September 18, 1975. In connection with its labor contracting business, the Di Dioses own a labor camp located near, but not on, Vista Verde property. Many of the workers employed by Vista Verde live at the Di Dios labor camp and the camp was the site of the incidents which gave rise to the instant proceeding.

Shortly after the passage of the ALRA in the summer of 1975, the United Farm Workers of America, AFL-CIO (union) began a union election campaign at Vista Verde Farms. During this period, both the management of Vista Verde and the Di Dioses made no secret of their opposition and hostility to the union's efforts. On one occasion, when two union organizers came to the farm to pass out leaflets to the workers, Bobby Di Dios told the organizers "to get out of there," and Lloyd Dumlao, one of Sylvester Dumlao's sons and a supervisor employed by Vista Verde, took the leaflets away from the workers and tore one leaflet up with a knife. Although Sylvester Dumlao was not present at this incident, he acknowledged that he had heard about it: he also stated that on four other occasions he had asked union organizers to leave his premises and that on two of those occasions he had called the sheriff to put them off. Sylvester additionally testified that he had spoken to Bobby Di Dios about the upcoming representative election and that he knew that Bobby, like he, was against the union.

The specific incidents at issue in this proceeding took place on Saturday, September 13, 1975. On that date, Jan Peterson, who was coordinating the election campaign at Vista Verde for the union, first learned that the representative election for Vista Verde Farms was to be held the next day. Upon receiving notice of the election, she sent union organizers to various places, including the Di Dios' labor camp, to notify those workers who were eligible to vote in the Vista Verde election. Although the workers supplied by Di Dios were not working at Vista Verde on that day or on the date of the election, under the ALRA all workers who had worked at Vista Verde during the preceding payroll

period were eligible to vote in the election (Lab. Code, § 1157), and many of the workers who lived at the Di Dios labor camp were eligible voters.

When the two labor organizers who had been sent to the Di Dios' labor camp returned unsuccessful in their efforts to speak to the employees, Peterson and the two organizers, all wearing union badges, returned to the labor camp, arriving at 3:30 - 4 p.m. At that time Bobby Di Dios was not present and the union organizers began talking to the workers about the imminent election.

After approximately 20 minutes, Bobby Di Dios arrived at the labor camp and immediately began pushing and shoving the two male union organizers and ordered all three organizers out of the camp. When Peterson attempted to get between Di Dios and the male organizers and to explain to Di Dios the purpose of their presence, Bobby continued the shoving, and asked one of the organizers to fight. When an argument ensued as to the organizers' right to talk with the workers in their own homes, Bobby finally left and returned at about 6 p.m. with several deputy sheriffs.

Approximately the same time that Bobby returned with the sheriffs, Sylvester Dumlao also arrived at the labor camp. Dumlao testified at the hearing that he, like Jan Peterson, had first learned on September 13 that the representative election was to be held the following day, and that, after notifying the workers who were in his field that afternoon, he set out to notify other eligible voters. Dumlao stated that when he arrived at the Di Dios labor camp, Bobby Di Dios and one of the officers came over to speak to him and told him that they were trying to get the organizers to leave.

After a short conversation between Bobby Di Dios, a police officer and Dumlao, which occurred within the view of both the union organizers and numerous workers, the officer cited Peterson and one of the other union organizers for trespass, and the organizers then left the labor camp. When the organizers had departed, Bobby Di Dios assisted Dumlao in assembling approximately 25 to 30 Vista Verde workers for a meeting about the election. Although Bobby was present at the meeting, only Dumlao spoke to the workers. After approximately one-half hour, Dumlao left the labor camp.[1]

---

[1]The union won the election held the following day, but after objection by the employer, the ALRB overturned the election on the ground that there had been

On the basis of the events which occurred at the labor camp, the ALRB's general counsel filed an unfair labor practice charge against Vista Verde. The general counsel maintained that the actions of Bobby Di Dios in (1) physically pushing and threatening to fight with union organizers, and (2) preventing such organizers from communicating with workers in their own homes, constituted improper interference, coercion and restraint of workers in the exercise of their statutorily guaranteed rights; moreover, the general counsel charged that, for unfair labor practice purposes, Vista Verde, who had engaged the labor contractor to supply the workers in question, should properly be held responsible for Di Dios' actions.

After a full evidentiary hearing which revealed the foregoing facts, the administrative law officer (ALO) concluded that an unfair labor practice had occurred for which Vista Verde was responsible. Although the ALO found no evidence that the conduct of Bobby Di Dios on the day in question was "specifically encouraged, authorized, abetted, participated in or ratified by Vista Verde Farms," she concluded that the labor contractor's conduct was nonetheless attributable to Vista Verde under the language of Labor Code section 1140.4, subdivision (c) providing that "[t]he employer engaging such labor contractor ... shall be deemed the employer for all purposes under this part."[2]

The ALRB, while agreeing with the ALO's determination that Vista Verde was liable for the labor contractor's actions, concluded that Vista Verde was responsible for Di Dios' actions both under the traditional, liberal "quasi-agency" principles embodied in federal labor decisions and alternatively, by virtue of the provisions of section 1140.4, subdivision (c) relied upon by the ALO as imposing "strict liability" upon an agricultural employer for the misconduct of a labor contractor.

The employer now challenges the ALRB's determination, arguing, first, that the evidence in this case is insufficient to impute to Vista Verde the conduct of its farm labor contractor under the principles embodied by applicable federal labor precedents, and, second, that the

---

inadequate notice to workers of the time and place of the election. (*Vista Verde Farm* (1977) 3 A.L.R.B. No. 19.) No question relating to the election is before us in the instant case.

[2]Unless otherwise indicated, all statutory references are to the Labor Code.

Board misinterpreted section 1140.4, subdivision (c) in construing the statute as establishing a novel "strict liability" standard of employer responsibility for labor contractor misconduct. As we explain, although we agree with the employer's latter contention, we conclude that under the general principles applicable in this area the Board properly found the actions of the labor contractor attributable to Vista Verde.

2. ■ *The actions of the labor contractor in this case constituted improper "interference with, coercion, and restraint" of workers in the exercise of the employees' statutorily protected rights under Labor Code section 1153.*

Labor Code section 1153 provides in relevant part that "[i]t shall be an unfair labor practice for an agricultural employer to [inter alia] ... interfere with, restrain or coerce agricultural employees in the exercise of the rights guaranteed in section 1152."[3] As a threshold matter we must recognize that the Board was unquestionably correct in finding that the actions of Bobby Di Dios on the afternoon of September 13, 1975—both in physically confronting the labor organizers and in barring their communication with workers in the workers' own homes—constituted improper "interference with, coercion and restraint" of workers in the exercise of their statutorily protected rights under section 1153.

As the ALRB has stated on numerous occasions *"physical confrontations between union and employer representatives are intolerable under the Act.* Absent compelling evidence of an imminent need to act to secure persons against danger of physical harm or to prevent material harm to tangible property interests, resort to physical violence of the sort revealed here shall be viewed by this Board as violative of the Act. Such conduct has an inherently intimidating impact on workers and is incompatible with the basic processes of the Act." (Italics added.) (*Tex-Cal Land Management, Inc.* (1977) 3 A.L.R.B. No. 14, p. 11, affd. (1979) 24 Cal.3d 335 [156 Cal.Rptr. 1, 595 P.2d 579]; see, e.g., *Green Briar Nursing Home, Inc.* (1973) 201 N.L.R.B. 503 [82 L.R.R.M. 1249, 1250]; *Sullivan Surplus Sales, Inc.* (1965) 152 N.L.R.B. 132,

---

[3]Section 1152, in turn, provides in relevant part: "Employees shall have the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities ...."

149 [59 L.R.R.M. 1041, 1045].) One of the principal goals of the ALRA is "to ensure peace in the agricultural fields" in California (Stats. 1975, Third Ex. Sess., ch. 1, § 1, p. 4013), and the physical pushing, shoving and threats of a fight engaged in by the labor contractor in this case plainly conflict with the objectives of the act.

In addition, many ALRB authorities similarly confirm that the labor contractor interfered with the statutorily guaranteed rights of the workers when he barred the union organizers from communicating with such workers in their own homes. Recognizing that such "communication at the homes of employees is not only legitimate, but crucial to the proper functioning of the Act" (*Silver Creek Packing Co.* (1977) 3 A.L.R.B. No. 13, p. 4), the ALRB has held that "Section 1152 guarantees the right of employees to converse with organizers at home, wherever that home is .... If an employee does not wish to speak with an organizer, that is, of course, his or her right. The owner or operator of a labor camp cannot exercise that right for the worker." (*Anderson Farms Co.* (1977) 3 A.L.R.B. No. 67, pp. 21-22; *Merzoian Brothers Farm Management Co., Inc.* (1977) 3 A.L.R.B. No. 62, pp. 3-4; *Silver Creek Packing Co., supra,* 3 A.L.R.B. No. 13; see also *United Farm Workers of America* v. *Superior Court (Buak Fruit Co.)* (1975) 14 Cal.3d 902, 910 [122 Cal.Rptr. 877, ·537 P.2d 1237].)

Indeed, as the ALRB noted in this case: "When an employer, or, as here, an employer's contractor, uses his power as landlord to dictate to employees that they cannot receive union visitors in their own homes, that action is in itself an awesome display of power which cannot but chill enthusiasm for union activity. The normal effect of such a showing of control over employees' lives is to give workers a sense of futility and thereby restrain the exercise of self-organizational rights in violation of the Act."[4]

Accordingly, the coercive, antiunion conduct in this case would unquestionably constitute an unfair labor practice under Labor Code section 1153 if engaged in directly by the employer. The crucial ques-

---

[4]Prior authorities under both the ALRA and NLRA establish that an employer cannot avoid responsibility for such unlawful conduct simply because it has resorted to law enforcement officers to effectuate the improper removal of labor organizers. (See, e.g., *Tex-Cal. Management, Inc., supra* 3 A.L.R.B. No. 14; *Central Hardware Co.* (1970) 181 N.L.R.B. No. 74 [73 L.R.R.M. 1422, 1424]; *Priced-Less Discount Foods, Inc.* (1967) 162 N.L.R.B. No. 872 [64 L.R.R.M. 1065].)

tion presented is whether an employer is shielded from unfair labor practice liability if such misconduct is perpetrated by a labor contractor whom the employer has hired rather than directly by the employer itself. It is to that question that we now turn.

3. *Under the ALRA, an employer may be held responsible for misconduct of its labor contractor, but the employer's liability for such actions is to be judged under the act's generally applicable principles of employer responsibility rather than under a unique standard of responsibility applicable only to the actions of labor contractors.*

As our court has noted on numerous occasions (see, e.g., *Vargas* v. *Municipal Court* (1978) 22 Cal.3d 902, 910-911 [150 Cal.Rptr. 918, 587 P.2d 714]; *Belridge Farms* v. *Agricultural Labor Relations Bd.* (1978) 21 Cal.3d 551, 556 [147 Cal.Rptr. 165]), in fashioning the provisions of the ALRA the drafters drew heavily upon the provisions of the NLRA; indeed, one provision of the ALRA, section 1148, specifically provides that "[t]he [ALRB] shall follow applicable precedents of the National Labor Relations Act, as amended." Although, as we discuss below, the relevant provisions of the ALRA do differ in some respects from the comparable NLRA provisions, because the basic statutory structure of the ALRA in this area does parallel that of the federal act we believe that it is useful to begin our analysis with a review of the governing federal precedents.

Shortly after the enactment of the federal act, the question of an employer's responsibility under the unfair labor practice provisions of the NLRA for actions which the employer had not specifically authorized or ratified came before the United States Supreme Court in two cases, *I. A. of M.* v. *Labor Board* (1940) 311 U.S. 72 [85 L.Ed. 50, 61 S.Ct. 83] and *H. J. Heinz Co.* v. *Labor Board* (1941) 311 U.S. 514 [85 L.Ed. 309, 61 S.Ct. 320].

In *I. A. of M.*, the employer argued that the NLRB had improperly held it responsible for organizational efforts of several low-level employees ("lead men") which it had neither expressly authorized nor ratified. Justice Douglas, writing for a unanimous Supreme Court, rejected the employer's contention, declaring: "The employer . . . may be held to have assisted the formation of a union even though the acts of the so-called agents were not expressly authorized or might not be attributable to him on strict application of the rules of *respondeat superior.* We are dealing here . . . with a clear legislative policy to free the collective bar-

gaining process from all taint of an employer's compulsion, domination or influence.... Thus, *where the employees would have just cause to believe that solicitors* professedly for a labor organization *were acting for and on behalf of management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates.*" (Italics added.) (311 U.S. at p. 80 [85 L.Ed. at p. 56].) Observing that whereas the lead men whose actions were in question "were not high in the factory hierarchy and apparently did not have the power to hire or to fire[,] . . . they did exercise general authority over [other] employees and were in a strategic position to translate to their subordinates the policies and desires of the management" (*ibid.*), the court concluded that the Board could properly hold the employer responsible for their actions.

In *Heinz*, the court, again speaking unanimously—this time through Justice Stone—rejected a similar claim by an employer that coercive, antiunion conduct engaged in by several supervisors could not be the basis of an unfair labor practice charge because there was no evidence that the employer had "authorized or ratified" the improper activities. Reiterating the analysis set forth in *I. A. of M., supra,* the *Heinz* court stated: "The question is not one of legal liability of the employer in damages or for penalties on principles of agency or *respondeat superior,* but only whether the Act condemns such activities as unfair labor practices so far as the employer may gain from them any advantage in the bargaining process of a kind which the Act proscribes. To that extent *we hold that the employer is within the reach of the Board's order to prevent any repetition of such activities and to remove the consequences of them upon the employees' right of self-organization,* quite as much as if he had directed them." (Italics added.) (311 U.S. at p. 521 [85 L.Ed. at p. 315].)

In the nearly four decades since the Supreme Court's decisions in *I. A. of M.* and *Heinz,* the federal courts have continued to apply the liberal principles of employer responsibility enumerated in these two seminal decisions. (See, e.g., *Cagle's, Inc.* v. *N. L. R. B.* (5th Cir. 1979) 588 F.2d 943, 947-948; *C & W Super Markets, Inc.* v. *N. L. R. B.* (7th Cir. 1978) 581 F.2d 618, 624, fn. 7; *O., C. & Atomic Wkrs. Int. Union, AFL-CIO* v. *N. L. R. B.* (D.C.Cir. 1976) 547 F.2d 575, 584-585, cert. den. (1977) 431 U.S. 966 [53 L.Ed.2d 1062, 97 S.Ct. 2923]; *N. L. R. B.* v. *General Metals Products Company* (6th Cir. 1969) 410 F.2d 473, 475-476, cert. den. 396 U.S. 830 [24 L.Ed.2d 81, 90 S.Ct. 83].) Indeed, in 1947, Congress effectively codified the holdings of *I. A. of M.* and

*Heinz*, by adding a separate provision, section 2(13), to the NLRA, providing that "[i]n determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." (29 U.S.C. § 152(13).)[5]

As the recent federal decisions reiterate, taken together *I. A. of M., Heinz* and section 2(13) demonstrate that "responsibility under the [NLRA] is not controlled by refinements of the law of agency. . . . In this type of case, vicarious liability does not depend on rigid application of principles of *respondeat superior.*" (*Amalgamated Clothing Wrks. of America* v. *N. L. R. B.* (D.C.Cir. 1966) 371 F.2d 740, 744.) Rather, "in determining the company's responsibility for the acts of others the rules of agency shall be given a liberal construction." (*N. L. R. B.* v. *General Metals Products Company, supra,* 410 F.2d 473, 475-476 and cases cited.) As Professor Gorman, a leading authority in this field, has stated: "[The] provisions [of the NLRA] permit the imputation to the employer not only of actions expressly authorized but also of actions which are impliedly authorized, and, more important, actions which are within the 'apparent authority' of the actor." (Italics added.) (Gorman on Labor Law (1976) p. 134.)

Thus, following the general teachings of *I. A. of M.* and *Heinz*, the federal decisions have viewed the question of employer responsibility from the viewpoint of the affected employees, and have generally taken as the touchstone whether the employees "would have just cause to believe that [the actor was] acting for and on behalf of management" (*I. A. of M., supra,* 311 U.S. at p. 80 [85 L.Ed. at p. 56]) or whether the employer has gained an improper benefit from the misconduct, and, as a realistic matter, has the ability "to prevent any repetition of such activities" or "to remove the consequences of [such activities] upon the

[5]Prior to 1947, section 2(2) of the NLRA defined "employer" to include "any person acting in the interest of an employer, directly or indirectly." (49 Stat. 449, 450 (1935).) In the Taft-Hartley Act of 1947, Congress modified this language to define employer as including any person "acting *as an agent* of an employer, directly or indirectly" (italics added) (61 Stat. 136, 137 (1947)); at the same time, Congress added section 2(13), quoted in text above. (*Id.,* at p. 139.) Although, since 1947, employers have argued on numerous occasions that the 1947 amendment of section 2(2) in effect cut back on the principles enunciated in *I. A. of M.* and *Heinz*, the federal courts have uniformly rejected this argument, pointing to section 2(13) as explicit congressional affirmation of the earlier decisions' holdings. (See, e.g., *N. L. R. B.* v. *Arkansas-Louisiana Gas Company* (8th Cir. 1964) 333 F.2d 790, 795-796; *Local 636, etc., Plumbing & Pipe Fit. Ind. of U.S.* v. *N. L. R. B.* (D.C.Cir. 1961) 287 F.2d 354, 359.)

employees' right of self organization ...." (*Heinz, supra,* 311 U.S. at p. 521 [85 L.Ed. at pp. 315-316].) (See, e.g., *O., C. & Atomic Wkrs. Int. Union, AFL-CIO* v. *N. L. R. B., supra,* 547 F.2d 575, 585; *Cagle's Inc.* v. *N. L. R. B., supra,* 588 F.2d 943, 947-948.)

Turning from the NLRA to the ALRA, the drafters of the California act clearly intended to establish a standard of employer responsibility which is at least as liberal as that applied under the federal act. Section 1140.2 declares it "to be the policy of the State of California to encourage and protect the right of agricultural employees . . . to be free from the interference, restraint or coercion *of employers of labor, or their agents* . . . in self-organization, or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." Section 1165, subdivision (b) reiterates this principle, providing that "any agricultural employer shall be bound by the acts of its agents." Section 1165.4 parallels section 2(13) of the NLRA, which effectively codified the teachings of *I. A. of M.* and *Heinz.* Section 1165.4 specifically provides that "[f]or the purpose of this part, in determining whether any person is acting as an agent of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."

While the foregoing provisions of the ALRA are virtually identical to the analogous provisions of the NLRA, section 1140.4, subdivision (c), the general statutory provision defining the term "agricultural employer," contains language which arguably broadens the scope of that category from that of the federal act. Whereas section 2(2) of the NLRA (29 U.S.C. § 152(2)) currently defines employer to include "any person acting as an agent of an employer, directly or indirectly," section 1140.4, subdivision (c) provides in its initial clause, that "[t]he term 'agricultural employer' shall be liberally construed to include any person acting directly or indirectly in the interest of an employer in relation to an agricultural employee...." On its face, this language represents an expansion over the specific language of the current federal act;[6] as we have already seen, however, the ALRA provision may in reality simply represent a codification of the "liberal construction" principles that have repeatedly been enunciated and applied in the federal case law over the past 40 years.

---

[6]The language of the ALRA including within the employer category "any person acting directly or indirectly in the interest of an employer" parallels the language of the

In any event, whether or not the drafters of the ALRA intended to go beyond the liberal principles articulated in the federal cases, we think that it is clear that in general an employer's responsibility for coercive acts of others under the ALRA, as under the NLRA, is not limited by technical agency doctrines or strict principles of respondeat superior, but rather must be determined, as *I. A. of M.* and *Heinz* suggest, with reference to the broad purposes of the underlying statutory scheme. Accordingly, even when an employer has not directed, authorized or ratified improperly coercive actions directed against its employees, under the ALRA an employer may be held responsible for unfair labor practice purposes (1) if the workers could reasonably believe that the coercing individual was acting on behalf of the employer or (2) if the employer has gained an illicit benefit from the misconduct and realistically has the ability either to prevent the repetition of such misconduct in the future or to alleviate the deleterious effect of such misconduct on the employees' statutory rights.

The specific question presented by the instant case is whether these general principles of employer responsibility for the acts of others remain applicable when coercive conduct is committed by a labor contractor rather than by some other person. ■ The issue arises because section 1140.4, subdivision (c)—the provision of the ALRA defining "agricultural employer"—contains language specifically relating to farm labor contractors which has no counterpart in the NLRA. Accordingly, we must determine what effect, if any, this additional language has on the issue of an employer's unfair labor practice responsibility for the actions of a labor contractor it has engaged.

Placing the relevant language in context, section 1140.4, subdivision (c) reads in pertinent part: "*The term 'agricultural employer' shall be liberally construed to include* any person acting directly or indirectly in the interest of an employer in relation to an agricultural employee, *any individual grower*, corporate grower ..., [or] harvesting association ... and shall include any person who owns or leases or manages land used for agricultural purposes, *but shall exclude any person supplying agricultural workers to an employer, any farm labor contractor as defined in Section 1682, and any person functioning in the capacity of a labor contractor. The employer engaging such labor contractor or per-*

---

pre-1947 NLRA. (See fn. 5, *ante.*) In addition the ALRA, unlike the pre-1947 NLRA statute, expressly provides that the term "agricultural employer" is to be "liberally construed."

*son shall be deemed the employer for all purposes under this part."* (Italics added.)

Although the available legislative history of the italicized language is somewhat scanty, at least the primary purpose of the addition of this language—excluding farm labor contractors from the definition of "agricultural employer" and at the same time, "deeming" the agricultural employer, i.e., grower, engaging such labor contractor as the employer for all purposes—did not relate to unfair labor practice matters at all. Rather the language was directed to the collective bargaining process and the question of bargaining units. Under the ALRA, collective bargaining takes place between *"agricultural employer[s]* and the representative[s] of the agricultural employees" (§ 1155.2), and the bargaining unit is designated as "all the agricultural employees of *an employer."* (§ 1156.2.) Consequently, the definition of "agricultural employer" bears directly on the collective bargaining and bargaining unit issues.

In the absence of any specific provision excluding farm labor contractors from the "agricultural employer" category, such contractors would naturally have fallen within such a classification. The relationship between a labor contractor and the workers under its control bears many of the hallmarks of a traditional employer-employee relationship since the contractor frequently exercises supervisory control over the workers and pays their wages. (See §§ 1682, subd. (b); 1695-1696.5.) For a number of substantial reasons which we discuss hereafter, however, the Legislature concluded that the bargaining process under the act should occur between unions and growers rather than between unions and labor contractors, and that bargaining units should be established on a grower-wide (also referred to as an "industrial" or a "wall-to-wall") basis rather than among workers employed by a particular labor contractor. It was to achieve this result that the ALRA excluded farm labor contractors from the definition of agricultural employer.

The establishment of "industrial" bargaining units, with collective bargaining directly between labor organizations and growers, afforded a variety of benefits for both agricultural employees and growers. From the farmworkers' point of view, an industrial bargaining unit including all agricultural employees of a grower meant that the same union would represent both the lowest paid field workers and more skilled and better paid agricultural workers; this arrangement facilitated the establishment of procedures which granted to field workers the opportunity of

promotion to higher paying jobs. (See Hg. Before the Assem. Lab. Relations Com. on Assem. Bill No. 1533 (May 12, 1975) p. 5 (testimony of Rose Bird, Sect. of Agr. & Services Agency).) A bargaining unit consisting solely of field workers of a particular labor contractor would, in contrast, not afford such opportunities. In addition, the Legislature apparently felt that farmworkers would be more secure, and find their remedies under the ALRA more effective, if collective bargaining agreements were entered into with the better capitalized and more stable growers, rather than with the more transient and typically less economically responsible farm labor contractors.

At the same time, this arrangement was also thought to hold a number of significant advantages for growers. Under an industrial bargaining unit scheme, a grower must negotiate and continually deal with only a single union for all of its agricultural workers (see *id.*); if the workers of each separate labor contractor constituted a separate bargaining unit, the typical grower—who often engages a number of labor contractors during the peak season—might find itself caught between the conflicting demands of a number of different unions. Moreover, from the point of view of efficiency and peaceful relations in the grower's agricultural fields, the Legislature apparently sought to avoid a situation in which union and nonunion employees would be working side-by-side in the same fields or in which some of a grower's workers, represented by a strong union, might be making higher wages than other workers of the same grower performing identical tasks.

From all appearances, the Legislature simply meant by adding the language in question to section 1140.4, subdivision (c), to establish this "industrial" bargaining unit scheme, with collective bargaining directly between growers and unions. The language utilized precisely accomplishes these objectives, excluding labor contractors from the statutory definition of "agricultural employer" for purposes of the ALRA but at the same time providing that the grower engaging the labor contractor shall be considered the employer of the agricultural workers supplied by the contractor for all purposes under the act.

Although the statutory language at issue was thus primarily directed to the collective bargaining process, the question remains whether such language should also be interpreted as affecting the treatment of unfair labor practice activities engaged in by a labor contractor, either by immunizing such labor contractor misconduct from all regulation under the act or by establishing a unique "strict liability" standard of employ-

er responsibility for such contractor misconduct. We conclude that the language should not be interpreted as having either such effect.

To begin with, for several reasons we find that the language in question clearly cannot properly be read as immunizing such misconduct of a labor contractor from any review or regulation under the act. First, the statutory language itself plainly does not support any such reading. Although the section excludes farm labor contractors from the definition of "agricultural employer" it immediately proceeds to "deem" the employer engaging the contractor as the employer for all purposes under the act. This concluding sentence demonstrates unequivocally that the Legislature did not intend to withdraw the protections of the act from employees supplied by farm labor contractors. Second, a separate provision of the Labor Code, section 1697, subdivision (b), enacted in the year immediately following the enactment of the ALRA, clearly indicates that the Legislature contemplated that actions of a labor contractor could fall within the proscriptions of the unfair labor practices provisions of the ALRA.[7]

Third and finally, in light of the basic purpose of the ALRA, the Legislature could not conceivably have insulated such misconduct of a labor contractor from all ALRB review or remedial action. The Legislature, of course, was well aware of the pervasive use of labor contractors in the agricultural sector in California and specifically granted the broad rights of self-organization and concerted activities to workers under the control of such labor contractors. Having done so, the Legislature could not reasonably have intended to proscribe coercive activities by the growers from whom such workers are generally removed, but to exempt from all regulation similar coercive activity whenever it is engaged in by the labor contractor with whom the workers have frequent and direct contact.[8]

---

[7]Section 1697, subdivision (b) was added to the statutory provisions regulating labor contractors in 1976. In general, the farm labor contractor statutes enumerate a number of grounds upon which a labor contractor's license may be revoked; section 1697, subdivision (b) established a private right of action for employees injured by a labor contractor's commission of a statutory violation. Recognizing that the ALRB has exclusive jurisdiction over labor contractor misconduct which constitutes an unfair labor practice (§ 1160.9), however, the Legislature explicitly excluded from section 1697, subdivision (b)'s private right of action "acts and conduct [of such labor contractor] also proscribed by Sections 1153, 1154, and 1155," the unfair labor practice provisions of the ALRA. Thus, the Legislature has specifically recognized that labor contractors may commit acts which fall within the ALRB's unfair labor practice jurisdiction.

[8]To the extent that it is inconsistent with this conclusion, the case of *People* v. *Medrano* (1978) 78 Cal.App.3d 198, 208-209 [144 Cal.Rptr. 217] is disapproved.

While agreeing that section 1140.4, subdivision (c) cannot be read completely *to exempt* labor contractor misconduct from the ALRB's review, the union maintains that the language in question should, on the contrary, be interpreted to establish a more stringent standard of employer responsibility for farm labor contractor misconduct than is applicable to similar misconduct of other persons. Emphasizing that the concluding sentence of section 1140.4, subdivision (c), provides that "[t]he employer engaging such labor contractor . . . *shall be deemed the employer for all purposes under the act*" (italics added), the union argues that the provision should be construed to render the employer "strictly liable" for all actions of the labor contractor, regardless of the circumstances of the particular case.

We believe that the union's proposed interpretation reads more into the concluding sentence of section 1140.4, subdivision (c) than the Legislature intended. While the statutory language indicates that the grower, rather than the contractor, is to be considered the statutory "employer" for purposes of the ALRA, the language in question does not speak to the issue of employer responsibility for the actions of the labor contractor and, in particular, does not explicitly provide that all actions of the labor contractor shall be deemed the actions of the employer (i.e., grower) for all purposes under the act. Inasmuch as the employer is not "strictly" or "absolutely" liable even for the actions of its own supervisors or foremen *under all circumstances*, we believe that if the Legislature had intended to enact such a strict liability standard with respect to labor contractor misconduct it would have done so in clearer, more explicit terms.

Thus, we conclude that the provisions of section 1140.4, subdivision (c) should not be read as establishing a distinct standard for employer responsibility with respect to the actions of labor contractors. Accordingly, we turn to the question of whether, under the ALRA's general principles of employer responsibility, the ALRB could properly find Vista Verde responsible for the actions of Bobby Di Dios in this case.

4. *Under the general principles of employer liability established by the ALRA, the ALRB properly found the employer responsible for the coercive conduct of its labor contractor.*

In maintaining that the ALRB improperly attributed Di Dios' conduct to it, Vista Verde asserts that the evidence does not suffice to show either that it specifically authorized Di Dios' conduct or that it subse-

quently ratified such conduct. The ALRB found, in contrast, that Dumlao's actions at the labor camp at the time the organizers were ejected from the premises and his subsequent conduct at the camp demonstrated the employer's "implied ratification" of the labor contractor's conduct, and that conclusion may well find adequate support in the record.[9] We need not resolve this question of implied ratification, however, because even if the employer did not explicitly or implicitly authorize or ratify Di Dios' conduct, we conclude that the conduct is nonetheless attributable to the employer for unfair labor practice purposes.

As we have already discussed, 40 years ago, in *I. A. of M.* and *Heinz*, the United States Supreme Court clearly held that an employer generally may not escape responsibility for improper or coercive activities of its supervisory personnel on the grounds that the employer itself had neither authorized nor ratified the improper conduct. Stressing that the forbidden, coercive effect upon employees would generally be present whenever the employees "would have just cause to believe that the [supervisors] were acting on behalf of the management" (*I. A. of M., supra*, 311 U.S. at p. 80 [85 L.Ed. at p. 56]), and that the employer would gain the illicit benefit of the coercive conduct whether or not the conduct was authorized or ratified, the court made clear that under such circumstances "the employer is within reach of the Board's [unfair labor practice] order to prevent any repetition of such activities and to remove the consequences of [such activities] upon the employees' right of self-organization, quite as much as if [the employer] had directed them." (*Heinz, supra*, 311 U.S. at p. 521 [85 L.Ed. at p. 315].)

The reasoning of *I. A. of M.* and *Heinz* directly applies to the instant case. Although the actions in question were engaged in by a farm labor contractor, rather than by the grower's supervisor or foreman, for un-

[9] In finding that the employer had implicitly ratified Di Dios' conduct, the Board reasoned: "It is clear that Dumlao was aware of what Di Dios was doing, conferred with him while he was doing it, and neither objected to the imminent expulsion nor disavowed Di Dios' actions after they occurred. The employer cannot escape liability by claiming that it was powerless to interfere. The Di Dioses had for many years provided service to the Employer. Their operation of the labor camp was part of the service they provided to employers, including Vista Verde; thus the Employer would have a continuing and compelling interest in the operations of that camp. It is logical to assume that if Dumlao had objected to the expulsion of the organizers by Di Dios, the latter would have as willingly obliged Dumlao by permitting the organizers to stay as he later obliged Dumlao by assembling the Vista Verde workers so Dumlao could address them. The Employer's silence as to the labor contractor's actions and his failure to repudiate those actions could only be interpreted by Di Dios, the employees present, or any reasonable person, as an implied ratification of those actions."

fair labor practices purposes we do not think that any meaningful distinction can be drawn between the two. Like a supervisor, the farm labor contractor is hired and compensated by the grower to supervise the activities of the agricultural employees of the grower. And, like the "lead men" in *I. A. of M.*, the farm labor contractor is clearly "in a strategic position to translate to [his] subordinates the policies and desires of the management." (311 U.S. at p. 80 [85 L.Ed. at p. 56].) In addition, because of the labor contractor's authority to hire and fire individual workers, the coercive impact of the contractor's actions are likely to be at least as great as that of the employer's most senior supervisory personnel. Finally, because a grower does have the power to retain or discharge a farm labor contractor and the contractor accordingly has a direct incentive to comply with the grower's directives, a grower will generally be in a position to prevent the repetition of unlawful activities by the labor contractor in the same way that it could generally control the conduct of its own supervisors.

To be sure, in exceptional circumstances an employer may be able to escape responsibility for misconduct of a labor contractor, just as it may occasionally escape responsibility for improper acts of a supervisor. (*N. L. R. B.* v. *Big Three Ind. Gas & Equipment Co.* (5th Cir. 1978) 579 F.2d 304, 309-312.) Thus, for example, if an employer publicly repudiates improper conduct and takes action to reprimand the labor contractor and to ensure that the conduct does not coerce or intimidate employees, the ALRB may find the employer not guilty of an unfair labor practice. (Compare *Imco Container Co. of Harrisonburg* v. *N. L. R. B.* (4th Cir. 1965) 346 F.2d 178, 181 with *Colson Corp.* v. *N. L. R. B.* (8th Cir. 1965) 347 F.2d 128, 137.)

Similarly, if over a period of time an employer has demonstrated to the employees in question that it will not interfere with their rights and will not discriminate against them on the basis of their union affiliations or activities, the employer may escape responsibility for sporadic or isolated misconduct of a labor contractor which it has not authorized or ratified. Under such circumstances employees may reasonably infer that the potentially coercive acts are unauthorized and do not represent the policy of the grower. (Cf., e.g., *National Labor Relations Bd.* v. *Cleveland Trust Co.* (6th Cir. 1954) 214 F.2d 95, 101-102.)[10]

---

[10]If, however, a grower hires a labor contractor with knowledge that the contractor has engaged in a course of intimidating antiunion conduct against its workers, the grower cannot properly reap the advantages of such coercive conduct but still escape all responsibility for the labor contractor's intimidating actions.

Vista Verde fails to demonstrate, however, that any of these exceptional circumstances occurred in the instant case. On the contrary, the record explicitly reveals that Di Dios' ejection of the labor organizers was in no way inconsistent with Vista Verde's established policy, but rather paralleled similar conduct engaged in on several occasions by Dumlao himself. Moreover, the record also demonstrates that although Dumlao was present when Di Dios barred the organizers from visiting Vista Verde employees in their homes, he took no steps to repudiate this action but instead enlisted Di Dios' aid to meet with the workers for his own purposes. Although the employer's presence at the scene of the misconduct is in no way a necessary prerequisite to the imposition of unfair labor practice responsibility, under the circumstances of this case we think that there can be no question but that the Board properly determined that the labor contractor's actions were attributable to the grower.

Finally, Vista Verde argues that even if it could otherwise be held responsible for Di Dios' misconduct, such attribution is inappropriate in this case because on September 13, 1975, the date when the misconduct occurred, the labor contractor was not actually supplying workers to Vista Verde. Although the record shows that the Di Dioses had been furnishing harvesting crews to the Vista Verde property for nearly 20 years, that the Di Dioses had furnished workers to Vista Verde in August (thus making the workers eligible for the Vista Verde representative election), and, indeed, that the Di Dioses again supplied Vista Verde with workers beginning on September 18, the employer apparently suggests that it cannot be held responsible for any acts that occur on a date when the labor contractor is not actually supplying workers to the grower.

We find this contention totally specious. As we have already seen, scores of cases in this area teach that an employer's liability does not turn on strict or technical agency doctrines. The labor contractor's conduct in this case was as destructive of employee rights and as attributable to the employer as would be similar misconduct committed by an employer's supervisor on a weekend or at an evening union meeting. (See, e.g., *O., C. & Atomic Wkrs. Int. Union, AFL-CIO* v. *N. L. R. B.*, *supra*, 547 F.2d 575, 585-586.) Indeed, it could hardly be clearer from the record that the Vista Verde-Di Dios relationship was very much intact and ongoing on the day in question, since immediately after ejecting the labor organizers from the labor camp, Di Dios willingly

complied with the grower's request to assemble the workers for a meeting with Dumlao. Accordingly, Vista Verde cannot avoid responsibility simply because none of Di Dios' workers actually worked in its fields on the day of the coercive conduct.

In brief summary, we believe that if the employer were generally to escape liability for coercive conduct toward his employees by his labor contractor, we would leave an hiatus in the act which would go far toward its nullification. We doubt that the Legislature enacted a statute that was inherently inoperative. If an employer could vicariously commit unfair labor practices, through the medium of a labor contractor, the ALRA could never attain its high purposes of labor peace through the orderly accommodation of the interests of employer and employee.[11]

Let a decree issue enforcing the order of the Board.

Mosk, J., Newman, J., and Racanelli, J.,* concurred.

---

[11]The dissenting opinion suggests that rather than protecting the rights of workers employed by a farm contractor, the proposed holding will actually work to the detriment of such employees. The dissent reasons that if a grower is held liable for a contractor's misconduct, the grower will necessarily react to any misconduct by terminating both the contractor and the workers whom the contractor has supplied to the grower, leaving the wronged workers jobless.

This reasoning suffers from a number of fundamental flaws. First, there is no basis for the assertion that the imposition of this liability on growers will generally lead to the termination of contractors. More likely, this potential liability will induce growers to insist that their labor contractors respect the rights of their workers, deterring contractor misconduct before it occurs. Moreover, if a labor contractor should resist grower control and continue to commit unfair labor practices so as to compel his own termination, it does not follow that individual farmworkers will necessarily lose their employment with the grower. If pruning or harvesting work continues to be available, these workers—already on the scene—may well be retained directly by the grower.

Finally, and most fundamentally, if the court were to adopt the interpretation proposed by the dissent, we would effectively strip farmworkers employed by labor contractors of the fundamental statutory rights afforded by the ALRA. Under the dissent's reading of the act, farm labor contractors would have no incentive whatsoever to refrain from bullying, intimidating or coercing workers who attempt to exercise their right to support a union or who engage in other concerted activities. On its face, such an interpretation conflicts directly with the fundamental purpose of the entire legislative scheme.

We also note that contrary to the dissent's intimation (see *post*, p. 331), our decision in this case expresses no view on the question of whether the ALRB may properly impose sanctions directly on a labor contractor for "unfair labor practice" activities that the contractor commits. That issue is not before us in this case.

*Assigned by the Acting Chairperson of the Judicial Council.

**CLARK, J.**—I dissent.

The Legislature was obviously aware of the role of labor contractors in agriculture in our state. In unequivocal language, it exempted them from the unfair labor practice provisions of the Agricultural Labor Relations Act (ALRA). The majority do not contend otherwise and there is sound reason for the legislative determination.

To avoid the legislative determination on a theory that the labor contractor—apart from "exceptional" circumstances (*ante*, p. 328)—is the agent of the employer to whom he furnished farm workers is not only to repudiate the legislative determination but also to sacrifice the most immediate and direct interests of agricultural employees—their jobs. Requiring innocent agricultural employees to sacrifice their jobs because a labor contractor allegedly acted improperly during an election campaign places the purity of their votes ahead of their jobs—a mistaken priority.

### THE STATUTORY EXEMPTION

Labor Code section 1153 of the Agricultural Labor Relations Act makes it an unfair labor practice "for an agricultural employer" to interfere with agricultural employees in the exercise of the rights guaranteed by section 1152.[1] Section 1153 also grants employers certain rights.

Section 1140.4 provides definitions of the terms used in the act. Section 1140.4, subdivision (c), provides: "[t]he term 'agricultural employer' shall be liberally construed to include any person acting directly or indirectly in the interest of an employer in relation to an agricultural employee, any individual grower, corporate grower, cooperative grower, harvesting association, hiring association, land management group, any association of persons or cooperative engaged in agriculture, and shall include any person who owns or leases or manages land used for agricultural purposes, *but shall exclude any person supplying agricultural workers to an employer, any farm labor contractor as defined by Section 1682, and any person functioning in the capacity of a farm labor contractor.* The employer engaging such labor contractor or person shall be deemed the employer for all purposes under this part."

---

[1]Unless otherwise indicated, all statutory references are to the Labor Code.

The underscored language establishes, that a labor contractor cannot be an "agricultural employer" within the meaning of Agricultural Labor Relations Act, and that he may not be held liable for unfair "employer" labor practices under the act. It was so held in *People* v. *Medrano* (1978) 78 Cal.App.3d 198, 206-209 [144 Cal.Rptr. 217], involving the same factual circumstances presented in the instant case.

The court pointed out: "The exclusion of farm labor contractors from ALRA coverage as agricultural employers reflects a deliberate legislative choice. The creation of stable collective bargaining relationships in agriculture is hindered by shifting employment and fluidity of the work force. To class farm labor contractors, along with farmers and farmer associations, as parties to collective bargaining would augment the difficulties. In the process of creating a collective bargaining relationship— from the initial organizing efforts, into the petition and election stages and ultimately to the contractual culmination—the statute views farmers or associations of farmers as the only employers (see §§ 1156-1159). A farm labor contractor may actually hire, supervise and pay the workers, becoming their actual employer (see, § 1682, subd. (b), fn. 2, *ante*). The ALRA excludes him from the statutory category of agricultural employers because he is excluded from the unionization and collective bargaining processes." (78 Cal.App.3d at p. 207.)

Section 1154 lists unfair labor practices for "a labor organization or its agents." Again labor contractors are excluded from the definition of labor organizations. (§ 1140.4, subd. (f).)

There was sound reason for the Legislature to exclude labor contractors from the unfair labor practice jurisdiction of the Agricultural Labor Relations Board (ALRB). In representation elections, the labor contractor, unlike an employer, is the competitor of the union or unions.

A labor contractor, of course, is a middleman. In furnishing persons to work for an agricultural employer, he is furthering the employer's interests. But in securing pay and other working conditions, he is furthering the employee's interests. His interests will often depart from that of both the employer and the employees. The labor contractor often works with several growers, and his conduct in a labor dispute may be dictated not by the interests of the grower involved in the dispute but by other grower clients or by purely selfish interests.

In representation elections, the labor contractor's role as a competitor of the·union or unions seeking representation is a most significant factor. While a grower expects to continue in business notwithstanding a union victory at the election, the concerned labor contractor faces the likelihood he will no longer serve the employees and employer should the union subsequently obtain a hiring hall provision in a collective bargaining contract. The fundamental purpose of the representation election· is to afford the employees a choice between expected benefits and burdens of union representation and continuation of employment and other benefits afforded by the labor contractor. (§ 1140.2.) Effectuation of the fundamental purpose of employee free choice precludes imposition of section 1153 employer liability—directly or indirectly—to labor contractors.[2]

Because in a representation election the labor contractor is the competitor of the labor organization, the unfair practice provisions, if any, which might be applied to labor contractors are those applicable to unions. However, it is apparent that most of such provisions are inapplicable to labor contractors. Most of those provisions deal with collective bargaining agreements, picketing, and boycotts. (§ 1154.) Labor contractors either cannot or do not engage in the conduct governed by those provisions.

The foregoing considerations provide ample reason for the Legislature to exclude labor contractors from the unfair labor practice jurisdiction of the ALRB under sections 1153 and 1154. It is apparent that regulation of labor contractors required different provisions. The Legislature so recognized and chose to regulate labor contractors under separate provisions under the jurisdiction of the Labor Commissioner and the courts. (§ 1682 et seq.) The pattern of exempting the labor contractor from the unfair labor practice provisions is followed by these statutes. Thus, section 1697, subdivision (b), permitting any employee to maintain an action for violation of the chapter specifically exempts actions based on conduct "proscribed by Section 1153 [unfair labor practices by employer], 1154 [unfair labor practices by unions . . . ."

---

[2]While, as the majority point out, one of the purposes of excluding labor contractors from the definition of "agricultural employer" was to establish bargaining units (*ante*, p. 323), the definition in section 1140.4 applies to the entire "part," and we cannot assume that the Legislature ignored the definition it had chosen when it adopted the important unfair labor practices provisions of the "part."

## The Majority Agency Theory

While there may be some arguments which would warrant the granting of jurisdiction by the Legislature to the ALRB to directly regulate contractor conduct, the Legislature has chosen not to do so. To judicially grant ALRB indirect jurisdiction to regulate contractors by punishing employers on an agency theory repudiates the legislative choice to deny it regulation of contractors. In response to a claim that a contractor should be characterized as a "supervisor" working for the employer, the court in *People* v. *Medrano, supra,* 78 Cal.App.3d 198, 209, responded: "The California Legislature did not exclude farm labor contractors from the law in the belief that the ALRB could reinsert them by labeling them as 'supervisors.'" Similarly, we should not frustrate the legislative intent in the guise of an agency doctrine.

Indirect regulation of contractors by ALRB through an agency doctrine has an additional unfortunate effect which alone requires repudiation of the doctrine. Such indirect regulation has the unfortunate effect of punishing innocent agricultural employees whose rights the majority purport to protect.

Imposing upon a grower a principal's liability for labor contractor misconduct can only encourage, if not coerce, the grower to sever relations with a labor contractor who has or may expose the grower to charges of unfair labor practices. When that relationship is terminated, the employer will necessarily discharge the contractor's crew consisting of the same agricultural employees whose voting rights assertedly have been infringed.[3]

While maintenance of the integrity of representational elections is an important consideration, it is the rights of farm workers with which we are ultimately concerned. Certainly, they should not be required to sacrifice their jobs because of campaign conduct on the part of their labor contractor. The majority solution, however, would kill those farm workers with kindness.

---

[3]The majority recognize that discharge of the contractor is the method by which the employer would prevent unfair labor practices. "[B]ecause a grower does have the power to retain or discharge a farm labor contractor and the contractor accordingly has a direct incentive to comply with the grower's directives, a grower will generally be in a position to prevent the repetition of unlawful activities by the labor contractor in the same way that it could generally control the conduct of its own supervisors." (*Ante,* p. 328.)

However, the majority fail to recognize that discharge of the contractor also results in discharge of his crew.

In exempting labor contractors from unfair labor practice provisions of the ALRA, the Legislature obviously realized, as we should, that not only are such provisions inappropriate for labor contractors, but that an employer—to avoid liability for contractor conduct—should not be coerced to cause the discharge of the very employees whose voting rights the act seeks to protect.

A refusal to impose agency liability upon employers for acts of contractors does not mean the employer may engage in unfair labor practices with impunity. Should an employer specifically direct or even encourage a contractor to engage in conduct in violation of unfair labor practice prohibitions, the employer will be liable for his own conduct. (See 1 Witkin, Summary of Cal. Law (8th ed. 1973) pp. 753-754, 756-757.)[4]

## FEDERAL LAW

Federal labor law does not warrant repudiation of the clear legislative intent or embracing an agency doctrine harmful to the workers. Such law does not contain any provision comparable to that in section 1140.4 specifically excluding labor contractors from the definition of agricultural employer and thereby excluding them from the unfair labor practice provisions applicable to employers. Thus that law is not helpful.[5]

Moreover, under proper application of federal precedents there has been no unfair labor practice.

Before an employer or union may be held vicariously liable for the acts of a third party, the National Labor Relations Board and the federal courts have held that it must be shown that there was an agency relationship. Pointing out that the same rules are applicable to claims of

---

[4]Employer liability based on his own misconduct does not encourage discharge of the concerned farm workers. An employer punished for his own misconduct is not coerced into discharging an innocent—insofar as the employer's liability is concerned—labor contractor and his crew.

[5]It is true that, as has been repeatedly pointed out, in fashioning the provisions of the ALRA the drafters drew heavily upon the provisions of the National Labor Relations Act (e.g., *Belridge Farms* v. *Agricultural Labor Relations Bd.* (1978) 21 Cal.3d 551, 556 [147 Cal.Rptr. 165, 580 P.2d 665]), and section 1148 provides that "[t]he board shall follow applicable precedents of the National Labor Relations Act, as amended." However, such matters must give way when, as here, it is evident that the Legislature has departed from the federal law.

employer misconduct as to union misconduct, the National Labor Relations Board reiterated the settled rules: "'1. The burden of proof is on the party asserting an agency relationship, both as to the existence of the relationship and as to the nature and extent of the agent's authority. (Mechem, Outlines of Agency (3d ed.) Secs. 106, 223.) In this case, for example, it was incumbent upon the General Counsel to prove, not only· that the acts of restraint and coercion alleged in the complaint were committed, but also that those acts were committed by agents of the Respondent Unions, acting in their representative capacity. The Respondents' failure to introduce evidence *negating* the imputations in the complaint did not relieve the General Counsel of that burden. [¶] 2. Agency is a *contractual relationship* deriving from the mutual consent of principal and agent, that the agent shall act for the principal. But the principal's consent, technically called authorization or ratification, may be manifested by conduct, sometimes even passive acquiescence as well as by words. Authority to act as agent in a given manner will be implied whenever the conduct of the principal is such as to show that he actually intended to confer that authority. (Restatement Agency (1933) Sections 1, 15.) [¶] 3. A principal may be responsible for the act of his agent within the scope of the agent's general authority, or the 'scope of his employment' if the agent is a servant, even though the principal has not specifically authorized or indeed may have specifically forbidden the act in question. It is enough if the principal actually empowered the agent to represent him in the general area within which the agent acted. This is the effect of Section 2(13) of the Act. . . . The Section restores the common law rule in cases arising under the Act, and avoids the construction which the Supreme Court gave to Section 6 of the Norris-LaGuardia Act in United Brotherhood of Carpenters v. U.S., 330 U.S. 395 [19 LRRM 2406].)'" (*International Longshoremen's and Warehousemen's Union, C.I.O.* (*Sunset Line & Twine Co.*) (1948) 79 N.L.R.B. No. 207, pp. 1487, 1508-1509 [23 L.R.R.M. 1001, 1005-1006].)

The settled rules requiring that the party asserting the agency relationship must establish the existence of the relationship based on consensual conduct has been followed in numerous cases. (*Shimman* v. *Frank* (6th Cir. 1980) 625 F.2d 80, 95; *North American Coal Corp.* v. *Local Un. 2262, U. M. W. of Am.* (6th Cir. 1974) 497 F.2d 459, 466-467; *Hyster Company* v. *N. L. R. B.* (5th Cir. 1973) 480 F.2d 1081, 1083; *National Labor Relations Board* v. *Mayer* (5th Cir. 1952) 196 F.2d 286, 290; *Johnston-Tombigbee Furniture Co.* (1979) 101 L.R.R.M. 1515, 1516-1517.)

There is no evidence in the instant case warranting a conclusion that the labor contractor was authorized to act as agent of the employer. Rather, the record shows that he was an independent contractor.

Nor does the record contain evidence showing ratification of the labor contractor's conduct. The employer arrived at the labor camp after the physical confrontation, and it does not appear that he was advised of the confrontation. When he arrived at the camp, the sheriff's deputies were there, and although he observed the labor contractor, the deputies, and the union organizers talking, he did not participate in the discussions and remained a substantial distance—150 feet—away. The contractor told the employer that he was trying to get the organizers to leave but he did not discuss the circumstances occurring earlier. After more conversation between the labor contractor, deputies, and organizers—witnessed by numerous workers—the employer observed the deputies give the organizers a piece of paper and then leave the labor camp. Again, the activities took place a substantial distance away from the employer. Afterwards, the employer spoke with the workers.

In the absence of any evidence that the employer was aware of the physical confrontation or the circumstances leading to the arrival of the deputies, there is no basis for a finding of ratification or other condonation of coercive conduct.

The majority, relying on federal authorities, conclude that the employer will be held liable for the acts of third persons for unfair labor practice purposes "(1) if the workers could reasonably believe that the coercing individual was acting on behalf of the employer or (2) if the employer has gained an illicit benefit from the misconduct and realistically has the ability either to prevent the repetition of such misconduct in the future or to alleviate the deleterious effect of such misconduct on the employees' statutory rights." (*Ante*, p. 322.) However, the cases relied upon are either cases where the actor was a low level employee— necessarily an agent for some purposes—(e.g., *I. A. of M.* v. *Labor Board* (1940) 311 U.S. 72 [85 L.Ed. 50, 61 S.Ct. 83]; *H. J. Heinz Co.* v. *Labor Board* (1941) 311 U.S. 514 [85 L.Ed. 309, 61 S.Ct. 320]) or where there was substantial circumstantial evidence that the actor was an agent in regard to activities closely related to the challenged activities (*Cagle's Inc.* v. *N. L. R. B.* (5th Cir. 1979) 588 F.2d 943; *N. L. R. B.* v. *General Metals Products Company* (6th Cir. 1969) 410 F.2d 473). In the latter cases, the agents did not have the same direct and immediate personal interest in the election as does a labor contractor.

The federal cases relied upon by the majority reflect that once an agency relationship is established by showing that the actor was an employee or otherwise acted as an agent, the National Labor Relations Board and the federal courts will not be bound with ordinary agency principles in determining whether specific acts were within the scope of the agent's authority. (§ 1165.4.) Those cases do not eliminate the burden of proving the agency.

Generally, a labor contractor is—as in this case—an independent contractor with a direct, immediate, and independent personal interest in a representation election. Generally—again, as in this case—he serves many growers. We cannot assume that because a representation election is to be had as to one of such growers, that grower can control the contractor's activities. Nor can we assume in the lack of evidence that the grower's and the contractor's interests are identical. The contractor is not an agent of the grower, and the cases relied on by the majority do not justify a conclusion that notwithstanding the lack of evidence of such agency, vicarious responsibility for the contractor's conduct attaches to the grower.

Finally, the majority cite no federal cases, and I am not aware of any, where an employer, to avoid liability was encouraged or coerced to discharge innocent workers whose rights were to be protected. The federal cases reflect greater compassion for the workers.

A peremptory writ should issue directing ALRB to set aside its decision and order and to enter an order dismissing the charges.

Richardson, J., concurred.